The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before former Deputy Commissioner Taylor and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. At the time of the occupational disease giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At such time, an employment relationship existed between plaintiff and defendant-employer.
3. Transportation Insurance Company was the compensation carrier on the risk.
4. A medical records index, consisting of the records concerning plaintiff from Dr. Vincent E. Paul, Allan C. Gorrod, M.S., OTR/L and David Harrington, P.T., collectively marked as Stipulated Documents 1, are stipulated into evidence.
5. Industrial Commission Form 22, dated 19 April 1994, marked as Stipulated Document 2, is stipulated into evidence.
* * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. At the time of the hearing of the above-captioned matter, plaintiff was a 45 year old woman. Plaintiff has a high school equivalency degree, and has work experience as a waitress, bartender, and cashier in the food service industry, and as a file clerk.
2. Plaintiff was hired by defendant-employer as a sales representative on 26 May 1992. Plaintiff initially worked out of the Burlington, North Carolina office, but after approximately one month, plaintiff transferred to the Greensboro office, and continued to live in Burlington.
3. Defendant-employer's business is that of compiling, distributing, and selling city directories. The weight and size of the directories vary from city to city, from about five pounds to about seven to eight pounds, depending upon the size of the city. Following her transfer to Greensboro, plaintiff had a sales area that included High Point, Winston-Salem, and Greensboro, for which Winston-Salem and Greensboro included two separate directories, one for the city and one a suburban directory.
4. Plaintiff worked full time five days per week, and typically drove approximately three to four hours per day to and between customer locations. The variance depended upon the area in which plaintiff was working, and whether plaintiff could walk from location to location, or had to drive between locations because of the distance involved. The balance of the work day, in excess of five hours, was spent in conversations and demonstrations with customers, filling out forms, carrying materials, clipping out ads and pasting them in directories for presentation to customers. Plaintiff is right handed, and used her right hand for writing and for clipping with scissors and pasting.
5. From 26 May 1992 until December of 1992, plaintiff drove approximately 16,000 miles on her job, and from January of 1993 until December of 1993, plaintiff drove approximately 16,500 miles on her job.
6. Plaintiff made anywhere from fifteen to thirty calls per day. The calls typically took about fifteen minutes, and occasionally as much as twenty-five minutes. Most of the time in each call was used to demonstrate the directory. To do so, plaintiff opened the directory and placed it in her left hand, palm up, with the directory resting in the left hand and open with the edge of the directory resting against her left wrist at a diagonal angle up to as much as five inches up the left arm. Plaintiff turned the pages with her right hand. Frequently this demonstration was made standing because of customer preference, or because of the lack of a convenient desk or table due to the location. In frequent instances, plaintiff balanced the directory on her left hand while standing rather than sitting.
7. In going to and from her car to call on a customer, or in walking from one location to another, plaintiff carried one or two directories in question, and usually carried it or them crooked in her left elbow resting on her arm with the fingers of her left hand curled around the directory, and also carried other sales materials. Plaintiff used both hands to get the directories and other sales materials out of her car and to return them at each stop.
8. Plaintiff first noticed symptoms in January of 1993, which consisted of a sharp pain up her left wrist which worsened. In addition, in closing the fingers of her left hand, plaintiff felt sharp pain in her left hand. Plaintiff noticed similar symptoms in her right hand. Both would begin to fall asleep at night while driving, and wake her after going to sleep with discomfort.
9. Plaintiff first saw Dr. Paul on 8 March 1993, who diagnosed carpal tunnel syndrome, bilateral, left greater than the right. Dr. Paul treated plaintiff conservatively, but without relief, and performed surgery, a release on the left on 1 June 1993, and a similar release on the right on 20 June 1993.
10. Plaintiff continued to work with increasing difficulty and discomfort, but because of her surgeries was out of work and incapable of earning wages with defendant-employer or in any other employment from 29 May 1993 until 22 September 1993, when she returned to work. After returning to work, plaintiff had an exacerbation of her symptoms, but continued to work with difficulty until 6 December 1993. Plaintiff last worked for defendant-employer on that date, and was terminated formally by defendant-employer on 7 July 1994. Plaintiff did not do any additional work for or earn any additional income from defendant-employer after 6 December 1993.
11. Plaintiff's employment with defendant-employer aggravated and exacerbated plaintiff's symptoms. Dr. Paul continued to treat the exacerbation of plaintiff's symptoms conservatively, but without relief, especially on the left hand. On 1 March 1994, Dr. Paul performed a more extensive release on the left than he had performed earlier. Dr. Paul considered an additional surgery on the right, but since her symptoms on the right had improved away from work, no additional surgery on the right was performed.
12. On 18 July 1994, Dr. Paul advised plaintiff to find work which did not involve significant heavy lifting, no carrying for long periods of time, or repetitive motions of the wrist. As a result of her contraction of bilateral carpal tunnel syndrome, plaintiff has a permanent partial impairment of eight percent to the left hand, and five percent to the right hand.
13. Dr. Paul saw plaintiff again on 4 November 1994. At that time, plaintiff's left hand was doing fairly well, although plaintiff's right hand was bothering her. At that time, plaintiff was advised to continue wearing a brace on her right hand. There was no change in plaintiff's permanency ratings, and plaintiff was advised to return to Dr. Paul as needed.
14. Since last working for defendant-employer on 6 December 1993, plaintiff has been employed by Silver Fox Mobile Homes from 6 August 1994 until 5 October 1994, where she earned $200.00 her first week, $500.00 for each week thereafter, $66.00 for her final week, and $1,200.00 at the time she was terminated for lack of production. In addition, plaintiff worked at a BP gas station as a cashier and clerk beginning 26 October 1994, at $5.00 per hour, as a cashier, clerk and stocker, working 18 hours her first week, and 32 hours her second week. Plaintiff worked there until 7 November 1994. On 9 November 1994, plaintiff was hired at a video store as an assistant manager, at $5.50 per hour for a 40 hour week.
15. Plaintiff was unable to work for defendant-employer due to her contraction of carpal tunnel syndrome from 29 May 1993 until 22 September 1993, and from 6 December 1993 and continuing.
16. Plaintiff's carpal tunnel syndrome, bilateral, was caused by her employment duties with defendant-employer.
17. Plaintiff's employment with defendant-employer placed her at an increased risk of developing carpal tunnel syndrome as compared to members of the general public not so employed.
18. As a result of her contraction of carpal tunnel syndrome, plaintiff reached maximum medical improvement with defendant-employer on 18 July 1994. As a result of her contraction of carpal tunnel syndrome, plaintiff has an eight percent permanent partial disability to her left hand and a five percent permanent partial disability to her right hand as a result of her bilateral carpal tunnel syndrome.
19. Plaintiff's average weekly wage with defendant-employer was $392.81, yielding a compensation rate of $261.86.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Plaintiff's bilateral carpal tunnel syndrome is due to causes and conditions characteristic of and peculiar to her employment with defendant-employer, is not an ordinary disease of life to which the general public not so employed is equally exposed, and is, therefore, an occupational disease. G.S. § 97-53(13).
2. At the time of plaintiff's contraction of an occupational disease, plaintiff's average weekly wage was $392.81, yielding a compensation rate of $261.86. G.S. § 97-2(5).
3. As a result of her contraction of a compensable occupational disease, plaintiff is entitled to temporary total disability compensation at the rate of $261.86 per week, for the period from 29 May 1993 until 22 September 1993, from 6 December 1993 until 6 August 1994, and from 5 October 1994 until 26 October 1994. G.S. § 97-29.
4. As a result of her contraction of an occupational disease, plaintiff is entitled to temporary partial disability compensation at the rate of $128.54 per week for the period of 6 August 1994 until 13 August 1994; at the rate of $201.86 per week for the period 27 October 1994 until 1 November 1994, at the rate of $153.20 per week for the period 2 November 1994 until 7 November 1994, and at the rate of $115.20 per week from and after 9 November 1994 and continuing for the balance of 300 weeks from 29 May 1993, or until plaintiff returns to work at the same or a greater average weekly wage than that which she had on 29 May 1993, whichever first occurs. G.S. § 97-30.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendants shall pay temporary total disability compensation at the rate of $261.86 per week, from 29 May 1993 until 22 September 1993, from 6 December 1993 until 6 August 1994, and from 5 October 1994 until 26 October 1994.
2. Defendants shall pay plaintiff temporary partial disability compensation at the rate of $128.54 for the period of 6 August 1994 until 13 August 1994; at the rate of $201.86 for the period 27 October 1994 until 1 November 1994, at the rate of $153.20 for the period 2 November 1994 until 7 November 1994, and at the rate of $115.20 from and after 9 November 1994 and continuing for the balance of 300 weeks from 29 May 1993 or until plaintiff returns to work at the same or a greater average weekly wage than that which she had on 29 May 1993, whichever first occurs. G.S. § 97-30.
3. Defendants shall pay all medical expenses, incurred or to be incurred, by plaintiff as a result of her contraction of compensable carpal tunnel syndrome.
4. A reasonable attorney fee of twenty-five percent of the compensation due plaintiff under this AWARD is approved for plaintiff's counsel and shall be paid as follows: twenty-five percent of the accrued benefits due plaintiff shall be deducted from that sum and paid directly to plaintiff's counsel. Thereafter, every fourth compensation check shall be deducted from the sum due plaintiff and paid directly to plaintiff's counsel.
5. Defendants shall pay the costs of this appeal.
 S/ _______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/ _______________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ _______________________ DIANNE C. SELLERS COMMISSIONER